FILED
United States Court of Appeals
Tenth Circuit

March 5, 2012

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

KEITH JONES,

    Plaintiff-Appellee,

v.

UNITED PARCEL SERVICE, INC.,

    Defendant-Appellant.

No. 09-3275

(D.C. No. 2:06-CV-02143-JPO)
(D. Kan.)

---

**ORDER**

---

Before **BRISCOE,** Chief Judge, **MCKAY** and **HARTZ**, Circuit Judges.

---

This matter is before the court on Keith Jones's *Petition for Rehearing en Banc*.

We also have before us the response filed by United Parcel Service on February 7, 2012.

Although Jones styled his petition as a petition for rehearing en banc, he requests in the

alternative that the panel's decision "be modified to include a determination of the

adjusted amount of the maximum punitive damages award." Aplee.'s Pet. For Rehearing

En Banc at 3. This request in the alternative appears to be a request for a panel rehearing,

and we have treated it as such.

Upon consideration of the request for panel rehearing, the panel has determined

that rehearing is appropriate. Consequently, the panel rehearing request is **GRANTED**,

and the clerk is directed to withdraw the Opinion originally filed in this matter on October 24, 2011. An amended opinion is attached to this order. The clerk is directed to file the new decision effective the date of this order.

The request for en banc consideration was transmitted to all judges of the court who are in regular active service. As no member of the panel and no judge in regular active service on the court requested that the court be polled, the request for en banc reconsideration is **DENIED.**

Entered for the Court,

Elisabeth A. Shumaker
Clerk of the Court

FILED
United States Court of Appeals
Tenth Circuit

**March 5, 2012**

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

KEITH JONES,

      Plaintiff-Appellee,

v.

UNITED PARCEL SERVICE, INC.,

      Defendant-Appellant.

No. 09-3275

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 2:06-CV-02143-JPO)**

Thomas B. Weaver of Armstrong Teasdale LLP, St. Louis, Missouri (Laurence R. Tucker and Melody L. Nashan of Armstrong Teasdale LLP, Kansas City, Missouri, with him on the briefs), for Defendant-Appellant.

George A. Barton, Law Offices of George A. Barton, P.C., Kansas City, Missouri (Fredrick D. Deay, II, Law Offices of Frederick D. Deay, II, Overland Park, Kansas, with him on the brief), for Plaintiff-Appellee.

Before **BRISCOE,** Chief Judge, **MCKAY,** and **HARTZ**, Circuit Judges.

**BRISCOE**, Chief Judge.

In this diversity action, Defendant United Parcel Service, Inc. ("UPS") appeals

following a jury verdict awarding Plaintiff Keith Jones ("Jones") over $2.5 million in

actual and punitive damages based on UPS's retaliatory discharge in violation of Kansas common law. See Gonzalez-Centeno v. N. Cent. Kan. Reg'l Juvenile Det. Facility, 101 P.3d 1170, 1173 (Kan. 2004) (describing common law cause of action for retaliatory discharge). Jones alleged, and the jury found, that UPS terminated Jones in retaliation for filing a workers' compensation claim. UPS alleges on appeal that (1) it is entitled to judgment as a matter of law on Jones's retaliation claim; (2) the district court erred in giving two improper jury instructions; (3) it is entitled to judgment as a matter of law on Jones's claim for punitive damages; (4) the district court erred in allowing the jury to decide the amount of punitive damages; and (5) the jury's award of $2 million in punitive damages violated its federal due process rights.

We have jurisdiction pursuant to 28 U.S.C. § 1291, and affirm in part, reverse in part, and remand. The evidence presented supports a reasonable inference in support of Jones's retaliation claim. Therefore, we affirm the district court's conclusion that UPS is not entitled to judgment as a matter of law on Jones's retaliation claim. We also conclude that the jury instructions in this case, although not a model of clarity, were not improper and that UPS, based on the evidence presented, is not entitled to judgment as a matter of law on Jones's claim for punitive damages. We ultimately conclude the district court did not err in instructing the jury to determine the proper amount of punitive damages in this case, relying on Federal Rule of Civil Procedure 38 and its incorporation of the Seventh Amendment right to trial by jury in federal cases. This reasoning obviates the need for any Erie analysis. Finally, we conclude that the jury's $2 million punitive damage award

is excessive and violates UPS's federal due process rights. We reverse and remand on this limited issue for the district court to enter a punitive damage award equal to the compensatory damage award.

# I

## *Factual Background*

Jones began working at the UPS Kansas City warehouse in 1985. Initially, Jones worked loading UPS delivery trucks, but in 1989 he was promoted to the position of package car driver. A package car driver delivers packages to UPS customers along a prescribed route, and as part of the job, must be able to lift packages weighing up to 70 pounds. While working as a driver, Jones suffered a series of work-related injuries. In 1991, he injured his left shoulder and underwent surgery to repair the damage. In 1993, he twisted his knee, although this injury did not require surgery. In 1996 and again in 1999, he injured his right shoulder and underwent surgery and extensive rehabilitation in order to fully recover. Jones filed workers' compensation claims for each of these injuries.

On October 6, 2003, Jones suffered his most recent work-related injury, this time to his left shoulder. Within six weeks, Jones filed a workers' compensation claim, and he began receiving workers' compensation benefits by mid-November 2003. Dr. Gary Legler, UPS's company doctor, examined Jones and concluded that he could return to work if he did not lift packages weighing more than 20 pounds and if he did not lift anything above shoulder level. Dr. Legler also referred Jones to an orthopedic specialist,

Dr. Daniel Stechshulte, for further evaluation.

Dr. Stechshulte examined Jones four times during October and November of 2003. During one of his visits, Jones took a functional capacity exam ("FCE"), which tests the ability of an employee to perform a desired job. A physical therapist interpreted the results of the test and concluded that Jones could not lift 70 pounds from his waist to his shoulder or over his head. Jones took another FCE on December 4 with the same results. Based largely on these test results, Dr. Stechshulte concluded that Jones could return to work, but with the following permanent lifting restrictions: no overhead lifting over 20 pounds and no chest-to-shoulder lifting over 45 pounds.

Jones alleges that Don Lewick, UPS's labor manager, reviewed Dr. Stechshulte's work release and told Jones that he could no longer work as a package car driver because of his permanent lifting restrictions. According to Jones, Lewick also told him that he could not work in any job at UPS with his restrictions. Jones subsequently contacted his union representative, who suggested he see another doctor. On February 4, 2004, Dr. Michael Poppa examined Jones and concluded that, as of the date of his examination, Jones could return to work as a package car driver without restrictions. Dr. Poppa's medical opinion, however, did not enable Jones to return to work. Pursuant to the collective bargaining agreement ("CBA") between UPS and the union, once Jones was cleared to work by his own doctor, he had to be re-examined by Dr. Legler.

Jones returned to Dr. Legler for a second examination on February 9, 2004. During this visit, Jones provided Dr. Legler with a copy of his work release from Dr.

Poppa, but he did not disclose the results of his previous FCEs or the fact that Dr. Stechshulte had imposed permanent lifting restrictions. As a part of his examination by Dr. Legler, Jones successfully performed a lift test which required him to demonstrate that he could lift 70 pounds. Following the examination, Dr. Legler released Jones to work without restrictions.

Dr. Legler sent a copy of Jones's work release to Monica Sloan, an occupational health manager in the human resources department at UPS. Her job was to "coordinate care for injured workers and to manage the disabilities of [UPS] employees." App. Vol. 8, at 1679. In that capacity, she received reports from physicians on "virtually a daily basis." Id. at 1698.

Sloan contacted Dr. Legler the same day she received Jones's work release and asked him if he was aware that Dr. Stechshulte had imposed a permanent 20-pound overhead lifting restriction on Jones in December 2003. Dr. Legler testified at trial that when he told Sloan he was unaware of Dr. Stechshulte's report, Sloan asked him "if he would . . . mind changing [his] return to work evaluation to reflect the 20 pound lift limit that Dr. Stechschulte had given [Jones]." Id. Vol. 4, at 851. Sloan testified, however, that she did not ask Dr. Legler to change his diagnosis; she simply asked him if he would review Dr. Stechschulte's work status report and the FCE evaluations and if he would "be willing to rethink the full duty release." Id. Vol. 8, at 1686-87. Following his conversation with Sloan, Dr. Legler changed Jones's work restriction to match Dr. Stechshulte's, at which point UPS again refused to permit Jones to return to work.

The following day, Jones filed a grievance with the union, alleging that UPS would not permit him to return to work despite being released by both Dr. Poppa and Dr. Legler. Add., at 209. The grievance panel directed UPS and Jones to follow the CBA's third-doctor procedure. Under the CBA, if the UPS doctor and the employee's doctor disagree, the parties must select a third doctor, "whose decision shall be final and binding." Id. at 35. The CBA further states that "[n]either the [e]mployer nor the Union [may] attempt to circumvent the decision" of the third doctor. Id. Shortly after the grievance panel issued its ruling, the parties selected Dr. Frederick Buck to examine Jones.

In May 2004, Dr. Buck examined Jones, watched him successfully complete basic lifting and strength tests, and concluded that another FCE would help him better evaluate Jones's abilities and limitations. Dr. Buck called Sloan and asked permission to perform another FCE, but Sloan stated that UPS would not pay for an FCE because Jones had received one the previous December.[1] Sloan also informed Dr. Buck that his evaluation of Jones was supposed to be based on Jones's prior medical records, rather than his current physical examination of Jones. Dr. Buck testified that he thought Sloan's request was unusual because he had never been asked to provide a medical opinion for an employer based solely on an employee's past medical records. Nonetheless, Dr. Buck followed Sloan's instructions and, using only "the medical records provided," concluded

---

[1] Pursuant to the CBA, UPS and Jones would have each paid half of the cost of the FCE.

that Jones could not perform the essential functions of a package car driver.  Id. at 211.

In June 2004, Jones filed a second grievance with the union, this time alleging that his visit to Dr. Buck had been "unfair" because UPS would not pay for another FCE and because UPS "didn't want Dr. Buck's opinion" regarding Jones's current physical state.  Id. at 214.  After holding a hearing on the matter, the grievance panel instructed Jones to see Dr. Buck again in order to "comply with [its previous] decision to implement the third party procedure."  Id. at 217.

Jones returned to Dr. Buck in August 2004.  However, when Dr. Buck met with Jones again, Dr. Buck was still under the impression that he was to base his opinion solely on the medical records as they existed as of May 2004.  Consequently, Dr. Buck again concluded, based on the "medical record office notes" of Dr. Stechshulte and Dr. Legler and without any "additional information," that Jones could not perform the work of a package car driver.  Id. at 218.  After receiving Dr. Buck's report, the union informed Jones that Dr. Buck's opinion was controlling, and UPS again told Jones that he could not return to work.

In January of 2005, Jones filed suit against UPS in the United States District Court for the District of Kansas, alleging disability discrimination and retaliation in violation of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101 et seq., and alleging retaliatory discharge in violation of Kansas common law.  The district court subsequently granted UPS's motion for summary judgment on Jones's ADA claims, see Jones v. United Parcel Serv., Inc., 411 F. Supp. 2d 1236 (D. Kan. 2006) (Jones I), and we

affirmed on appeal, see Jones v. United Parcel Serv., Inc., 502 F.3d 1176, 1180-82 (10th Cir. 2007) (Jones II).  However, the district court denied UPS's motion for summary judgment on Jones's state law claim and because Jones had not alleged diversity of citizenship, declined to exercise supplemental jurisdiction over the claim prospectively. Jones I, 411 F. Supp. 2d at 1261.

Jones subsequently re-filed his state law retaliatory discharge claim, this time in the District Court of Wyandotte County, Kansas.  UPS then removed this action to federal district court.  After a six day trial, the jury found in Jones's favor, awarding him $630,307 in actual damages and $2 million in punitive damages.[2]  Shortly thereafter, UPS filed a motion for a new trial and a motion for judgment as a matter of law.  The district court denied these motions and entered judgment on the jury verdict.  UPS then timely appealed to this court.

## II

*Judgment as a Matter of Law on Jones's Claim of Retaliation*

UPS alleges the district court erred in denying its motion for judgment as a matter of law and its motion for a new trial.  We review de novo the district court's denial of a motion for judgment as a matter of law.  Cummings v. Gen. Motors Corp., 365 F.3d 944, 949 (10th Cir. 2004).  In diversity cases, "the substantive law of the forum state governs

---

[2] Pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure, the parties agreed to try this case before a United States magistrate judge.  See Dist. Ct. Dkt. #102.

the analysis of the underlying claims, including specification of the applicable standards of proof, but federal law controls the ultimate, procedural question whether [judgment as a matter of law] is appropriate." Wagner v. Live Nation Motor Sports, Inc., 586 F.3d 1237, 1244 (10th Cir. 2009) (internal quotation marks omitted). Under federal law, "[a] party is entitled to judgment as a matter of law only if all of the evidence, viewed in the light most favorable to the nonmoving party, reveals no legally sufficient evidentiary basis to find for the nonmoving party." Burrell v. Armijo, 603 F.3d 825, 832 (10th Cir. 2010). Judgment as a matter of law "is warranted only if the evidence points but one way and is susceptible to no reasonable inferences to support the party opposing the motion." Baty v. Willamette Indus., Inc., 172 F.3d 1232, 1241 (10th Cir. 1999) (citation and quotation omitted).

UPS argues it is entitled to judgment as a matter of law on Jones's claim for retaliatory discharge because (1) he failed to establish a prima facie case of retaliation; and (2) he failed to prove that UPS's reason for discharging him was pretextual.

The employer-employee relationship in Kansas is governed by the doctrine of employment-at-will. Goodman v. Wesley Med. Ctr., LLC, 78 P.3d 817, 821 (Kan. 2003). Pursuant to this doctrine, "an employer can terminate an employee for good cause, for no cause, or even for a wrong cause, without incurring liability to the employee for wrongful discharge." Bracken v. Dixon Indus., Inc., 38 P.3d 679, 682 (Kan. 2002) (internal quotation marks omitted). There are, however, several recognized exceptions to Kansas's employment-at-will doctrine. For example, an employer may not terminate an employee

-9-

"in retaliation for filing a workers compensation claim, or in anticipation of the employee filing [such a] claim." Id. (internal citations omitted).

"Kansas has adopted the McDonnell Douglas burden-shifting analysis for employment discrimination cases."[3] Rebarchek v. Farmers Co-op. Elevator, 35 P.3d 892, 898 (Kan. 2001) (citations omitted). Thus, when a plaintiff alleges he or she was terminated in retaliation for filing a workers' compensation claim, the plaintiff bears the burden of establishing a prima facie case of retaliatory discharge. Id. In order to establish a prima facie retaliation claim, the plaintiff must show: (1) he or she filed a claim for workers' compensation benefits; (2) the employer had knowledge of the

---

[3] Our court has held that the McDonnell Douglas burden shifting analysis does not apply beyond the summary judgment stage. When a plaintiff brings federal discrimination claims, and "establishes a prima facie case . . . , the case then moves to trial, where the presumption of discrimination created by the prima facie showing simply drops out of the picture." Randle v. Aurora, 69 F.3d 441, 453 (10th Cir. 1995) (citation and internal quotation marks omitted). We are unable to find a similar pronouncement from the Kansas courts. It appears from a reading of Kansas discrimination cases that Kansas courts follow the McDonnell Douglas framework in discrimination cases without distinguishing between trials and motions for summary judgment. See Rebarchek, 35 P.3d at 898. This is evident from the fact that fact-finders in Kansas discrimination trials address the prima facie discrimination prong of the McDonnell Douglas analysis in determining whether the defendant is liable for discrimination. See Beech Aircraft Corp. v. Kan. Human Rights Comm'n, 864 P.2d 1148, 1153, 1158 (Kan. 1993) (The district court, as the "finder of fact[,] . . . determined that the complainant . . . failed to establish a prima facie case."); Woods v. Midwest Conveyer Co. Inc., 648 P.2d 234, 239 (Kan. 1982) ("The record discloses the complainant's evidence was determined by the trier of fact to establish a prima facie case of discrimination."); Kan. Human Rights Comm'n v. Dale, 968 P.2d 692, 695 (Kan. App. 1998) (affirming the district court's adoption of the Kansas Human Rights Commission's factual finding that the plaintiff presented a prima facie discrimination case). Accordingly, we will address whether the jury correctly concluded that Jones presented a prima facie case of discrimination.

-10-

plaintiff's workers' compensation claim; (3) the employer terminated the plaintiff's employment; and (4) a causal connection existed between the workers' compensation claim and his or her termination. Id. at 899. The burden of establishing these elements "is not . . . onerous." Id. at 901.

In Kansas, "an employer may avoid liability by demonstrating that the discharge was motivated by the employee's [physical] inability to return to his duties, rather than because the employee exercised his rights under the Workers Compensation Act." Sanjuan v. IBP, Inc., 275 F.3d 1290, 1294 (10th Cir. 2002). Nonetheless, "[i]t does not follow . . . that retaliatory animus can never exist if the discharged employee is unable to perform his duties at the time he was fired." Id. Accordingly, "in the final analysis," the court must ask "what was the motivation for firing the plaintiff?" Id. at 1295 (internal quotation marks and alterations omitted).

UPS claims the district court erred in denying its motion for judgment as a matter of law because Jones failed to establish a prima facie case of retaliation. Specifically, UPS asserts that "there is no evidence that Ms. Sloan's contacts with Dr. Legler and Dr. Buck, even if inappropriate, were in retaliation for a workers' compensation claim, or that [Jones's] workers' compensation claim played any role in his initial discharge or in the decision by UPS not to reinstate him." Aplt. Br. at 23. In response, Jones argues the district court correctly denied UPS's motion because he brought forth evidence that "there was a close temporal proximity between the filing of [his] workers' compensation claim . . . and the onset of UPS's retaliatory conduct against [him]" Aple. Br. at 24.

-11-

We agree with Jones and conclude that there was a legally sufficient evidentiary basis for the jury to find that Jones presented a prima facie claim of retaliation for filing a workers' compensation claim in October 2003. Immediately after Dr. Legler determined that Jones could return to work in February 2004, Sloan called Dr. Legler and asked if he would change his evaluation to correspond with work restrictions Dr. Stechschulte had placed on Jones. In addition, Sloan told Dr. Buck, the third-party doctor, that UPS would not pay for another FCE (which Dr. Buck had wanted to complete his evaluation of Jones) and that he should base his opinion solely on Jones's previous medical records. Finally, after the grievance panel ordered Jones to return to Dr. Buck for an examination in compliance with the CBA, Sloan made no effort to inform Dr. Buck that, contrary to what she had previously told him, the grievance panel wanted him to make an independent determination regarding whether Jones could return to work based on his present physical condition. We conclude that this evidence, taken together, indicates UPS may have retaliated against Jones for filing a workers' compensation claim.[4]

_____

[4] Although the dissent would sustain the jury's verdict regarding UPS' liability for retaliation, it is uncomfortable with the court's conclusion that there is a sufficient temporal proximity to give rise to a finding of causation. The dissent claims that "three months . . . is too long a period from which to infer causation absent other evidence." Dissent at 2. The dissent correctly notes that a three month period from the date of the worker's compensation claim to the adverse employment action, standing alone, does not give rise to causation. See Trujillo v. PacifiCorp, 524 F.3d 1149, 1157 n.5 (10th Cir. 2008) (collecting cases). However, in this case, there is sufficient evidence, in addition to the three month period, that supports the jury's conclusion that UPS retaliated against Jones. As noted above, Sloan's phone call to Dr. Legler (immediately after she learned that Jones would be able to return to work), her conversations with Dr. Buck, and her failure to inform Dr. Buck of the purpose of Jones' second visit all support the jury's

-12-

UPS also claims that even if Jones did establish a prima facie case of retaliation, it is still entitled to judgment as a matter of law because Jones failed to prove that its reason for terminating his employment was pretextual. According to UPS, it decided not to reinstate Jones based solely upon Dr. Buck's second diagnosis. UPS further alleges that any evidence of Sloan's interference with Jones's medical treatment fails to establish that UPS's stated reasons for terminating his employment were pretextual.

Having reviewed the record on appeal, we conclude that there was a legally sufficient evidentiary basis for the jury to find that UPS terminated Jones for pretextual reasons. UPS alleges it terminated Jones based solely on Dr. Buck's second report, but this report was clearly incomplete. As with his first report, Dr. Buck stated that his second report was based only on Jones's previous medical reports and that he did not perform an independent medical evaluation. Dr. Buck testified that he did not know why Jones had come for a second examination, and that Jones never explained why he was there.[5] App. Vol. 8, at 1644-45. This fact is particularly important given that the grievance panel ordered Jones to return to Dr. Buck in order to "comply with [its previous] decision to implement the third party procedure." App., at 217.

Moreover, in addition to knowing the grievance panel was not satisfied with Dr.

verdict.

[5] Although the dissent argues that Dr. Buck would have heard only from Jones regarding the reason for his second visit, and that it is "baffling" why Jones did not explain the reason behind the second visit (dissent at 6), from Dr. Buck's own testimony, it is clear the reason for Jones' second visit was not explained to him by any party, thus leaving Dr. Buck to just repeat in his second report what he said in his first.

-13-

Buck's initial report, there is evidence that UPS knew one of its employees was responsible for Dr. Buck's confusion and chose not to remedy the situation. Don Lewick, the labor relations manager, testified that he spoke with Sloan about her conversation with Dr. Buck and then instructed her not to speak with Dr. Buck before the second evaluation because she might "muddy the waters." Id. Vol. 5, at 1177-78. Given Dr. Buck's incomplete initial reports, which pursuant to Sloan's instructions were based on Jones' past evaluations and not his present condition; the grievance panel's order that Jones return to Dr. Buck for an evaluation of his present condition; and Lewick's instructions to Sloan to not speak with Dr. Buck before he conducted his second evaluation,[6] thereby leaving Dr. Buck with the impression that he was to again base his evaluation of Jones on his past evaluations, we conclude that a jury could have reasonably determined that UPS's stated reason for terminating Jones's employment was pretextual. Accordingly, the district court did not err in denying UPS's motion for judgment as a matter of law on Jones's retaliation claim.

*Jury Instructions 15 and 16*

UPS argues it is entitled to a new trial because the district court gave two jury

---

[6] UPS argues that Lewick's instructions to Sloan actually indicate his desire that UPS not interfere with Jones' medical treatment so that Jones could truly obtain an independent medical examination as required under the CBA. We note that the jury could have viewed this evidence in this manner; nonetheless, we also conclude that the jury could have reasonably viewed this evidence to mean that Lewick wanted Dr. Buck to remain under the assumption that he was to base his medical evaluation solely on Jones' prior medical history.

-14-

instructions that misstated Kansas law. "We review the district court's decision to give a particular jury instruction for abuse of discretion and consider the instructions as a whole de novo to determine whether they accurately informed the jury of the governing law." Garcia v. Wal-Mart Stores, Inc., 209 F.3d 1170, 1173 (10th Cir. 2000) (internal quotation marks omitted). "Faulty jury instructions require reversal when (1) we have substantial doubt whether the instructions, considered as a whole, properly guided the jury in its deliberations; and (2) when a deficient jury instruction is prejudicial." McInnis v. Fairfield Cmtys., Inc., 458 F.3d 1129, 1141 (10th Cir. 2006) (internal quotation marks and alteration omitted).

UPS argues that Instructions 15 and 16 were improper. They read as follows:

Instruction 15:

> Provided you find plaintiff is entitled to recover under Instruction 12, you are further instructed that Kansas law does not prohibit the termination of an employee who is unable to perform his work at the time of his discharge, even if the inability to work was due to a work-related injury.

App. Vol. 1, at 138 (underline in original).

Instruction 16:

> Provided you find plaintiff is entitled to recover under Instruction 12, you are further instructed that the Kansas Workers' Compensation Act does not impose a legal duty on the employer to consider or find alternative employment for an injured employee who is unable to return to his former position at the time of his discharge.

Id. at 139 (underline in original).

Instruction 12, which is referenced in instructions 15 and 16, reads as follows:

-15-

To prevail on his claim of retaliatory discharge, the plaintiff, Keith Jones, has the burden of proving by a preponderance of the evidence that there is a causal connection between his worker's compensation claim and the termination of his employment by the defendant, UPS.

If plaintiff meets his burden, UPS must offer evidence of a non-retaliatory reason for plaintiff's discharge other than the fact that plaintiff had filed a worker's compensation claim. If you find UPS has failed to offer evidence of a legitimate non-retaliatory reason for plaintiff's discharge, then you must find for the plaintiff. If you find UPS has presented evidence of a non-retaliatory reason for plaintiff's discharge, plaintiff must prove the reasons stated by defendant are merely a pretext for UPS'[s] actual intent to retaliate.

Id. at 135.

UPS alleges that Instructions 15 and 16 misstate Kansas law because the phrase "provided you find" instructed the jurors to first decide if plaintiff prevailed under Instruction 12, and only then consider whether UPS avoided liability based on Instructions 15 and 16. Thus, according to UPS, Instructions 15 and 16 turned the reasons for UPS's termination into "affirmative defenses" and therefore improperly "shifted the burden to UPS to undo the jury's determination of liability under Instruction 12." Aplt. Br. at 30.

We conclude that Instructions 15 and 16 did not inform the jury regarding the law as well as they could have. We find it somewhat unusual that the district court instructed the jury to consider potential defenses to Jones' claim for retaliatory discharge only after it found that Jones was entitled to recover under this cause of action. It would have been more helpful for the district court to inform the jury that Instructions 15 and 16 identify acceptable defenses to Jones' claim and that they should be considered in conjunction

-16-

with Instruction 12, which outlined Kansas law regarding retaliatory discharge.

Despite our concern regarding Instructions 15 and 16, however, we conclude that the district court's failure to adequately instruct the jury in this regard was not prejudicial to UPS. As noted previously, Kansas has adopted the <u>McDonnell Douglas</u> burden-shifting analysis for employment discrimination cases. <u>Rebarchek</u>, 35 P.3d at 898. Accordingly, Instruction 12 properly informed the jury that Jones was required to put forth a prima facie case of retaliation, at which point UPS was required to present the jury with a legitimate, non-pretextual reason for terminating his employment. <u>Bracken</u>, 38 P.3d at 682. Although it would have been better if the district court had not instructed the jury to consider UPS's defenses only after determining whether Jones could recover for retaliatory discharge, we conclude that Instructions 12, 15, and 16, taken together, accurately summarized the law in such a way that the jury could render a proper verdict in light of all the evidence. For this reason, we deny UPS's request for a new trial based on improper jury instructions.

*Judgment as a Matter of Law on Punitive Damages*

Next, UPS argues the district court erred when it denied its motion for judgment as a matter of law on Jones's claim for punitive damages. According to UPS, we should reverse the district court's decision (1) because there is insufficient evidence to indicate that Sloan acted "with the intent necessary for the imposition of punitive damages" and (2) because there is no evidence that UPS authorized or ratified Sloan's conduct. Aplt. Br. at 34. As noted previously, we review the district court's denial of a motion for

-17-

judgment as a matter of law de novo, Cummings, 365 F.3d at 949, and will reverse "only if all of the evidence, viewed in the light most favorable to the nonmoving party, reveals no legally sufficient evidentiary basis to find for the nonmoving party," Burrell, 603 F.3d at 832.

*1.     Availability of Punitive Damages*

In diversity cases, state law governs the substantive elements upon which a punitive damage award may be based. Miller v. Cudahy Co., 858 F.2d 1449, 1457 (10th Cir. 1988). In Kansas, a plaintiff may recover punitive damages if he or she proves by "clear and convincing evidence" that the defendant acted "with willful conduct, wanton conduct, fraud, or malice." Kan. Stat. Ann. § 60-3702(c).

We start by noting that in retaliation claims in Kansas, "punitive damages may not be imposed automatically on an employer when a jury finds unlawful retaliation." Hysten v. Burlington N. Santa Fe Ry. Co., 530 F.3d 1260, 1277 (10th Cir. 2008). This is because an award of punitive damages is improper when "the evidence . . . show[s] that the employer reasonably believed that his retaliatory conduct was entirely lawful." Id. at 1277-78. Nonetheless, an employer can be liable for punitive damages, even if it does not know it is violating an employee's rights, "so long as the employer appreciates the wrongfulness, harmfulness, or injuriousness of the act itself." Id. at 1277. Accordingly, "when an employer terminates an employee in contravention of Kansas public policy and presents pretextual justifications to conceal this conduct, a jury [can] infer that the employer was acting with the purpose of doing something wrongful." Id.

-18-

The jury's imposition of punitive damages was appropriate here because there was a legally sufficient evidentiary basis for the jury to find that Sloan's conduct was willful and malicious. The evidence indicates that Sloan, on multiple occasions, intentionally interfered with the doctors' medical evaluations in an attempt to prevent Jones from returning to work. Sloan first called Dr. Legler and asked him to change his diagnosis, even though he observed Jones perform a lift test and concluded that he could return to work. Sloan also told Dr. Buck that UPS would not pay for another FCE even though two other doctors had indicated that Jones could return to work. Moreover, Sloan misled Dr. Buck when she told him that he was supposed to base his opinion solely on Jones's past medical records. Finally, after the grievance panel instructed Jones to return to Dr. Buck in order to comply with the CBA's third-party doctor procedure, Sloan made no effort to inform Dr. Buck that, contrary to what she had previously told him, he was to make an independent determination regarding Jones's present physical limitations. In light of Sloan's repeated attempts to prevent Jones from returning to work by both omission and commission, we conclude that a jury could reasonably find that punitive damages were appropriate.

2. *UPS's Knowledge*

UPS also argues that even if Sloan's actions warranted an award of punitive damages, it cannot be liable for punitive damages because it did not authorize or ratify her conduct. Under Kansas law, punitive damages may not be assessed against "[an] . . . employer for the acts of . . . [an] employee unless the questioned conduct was authorized

-19-

or ratified by a person expressly empowered to do so on behalf of the . . . employer[.]"

Kan. Stat. Ann. § 60-3702(d)(1). Authorization or ratification under § 60-3702(d)(1)

"may be either express or implied." Smith v. Printup, 866 P.2d 985, 1003 (Kan. 1993).

Implied ratification may be "based on a course of conduct indicating the approval,

sanctioning, or confirmation of the questioned conduct." Id.

We first address whether there was a legally sufficient evidentiary basis for the

jury to conclude that a UPS employee was "expressly empowered" by UPS to authorize

or ratify Sloan's improper conduct. Based on the evidence presented at trial, we conclude

that the jury could have reasonably determined that Don Lewick, the labor manager in

UPS's Kansas City office, was such an individual. Lewick testified at trial that as a labor

manager he worked to resolve "labor issues" arising from certain employment situations.

App. Vol. 5, at 1154. As part of this work, Lewick would hear grievances filed by

employees, attempt to settle those grievances, and, in the event the grievance could not be

settled, present UPS's case before the union grievance panels. Id. at 1154-55. Not

surprisingly, the record indicates Lewick was actively involved in Jones's dispute with

UPS. According to Jones, it was Lewick who first told Jones that he would not be able to

return to work at UPS. And Lewick himself testified that he received reports from the

human resources department regarding Jones's doctors appointments, that he represented

UPS in Jones's grievance proceedings, and that he met with Sloan regarding her

interactions with Dr. Buck and instructed her regarding how to proceed. Id. Vol. 5, at

1162-66, 1175, 1177-78. Given these facts, we conclude that the jury could have

-20-

reasonably found that Lewick was authorized by UPS to authorize or ratify Sloan's conduct.

We also conclude that there was a legally sufficient evidentiary basis for the jury to find that Lewick did in fact authorize or ratify Sloan's interference with Jones's attempts to return to work. Lewick knew Dr. Legler initially concluded that Jones could return to work without restrictions. Lewick testified that he received Dr. Legler's initial report and that after he read the report, he was informed by someone in the human resources department that an "amended release" from Dr. Legler would be forthcoming. Id. at 1162-63. Lewick then received an amended report from Dr. Legler which indicated Dr. Legler had changed his initial conclusions to now conclude that Jones could not return to work. Id.

In addition, as Lewick represented UPS in Jones's grievance proceedings, he was aware of all of the facts surrounding Jones's grievances and was therefore likely on notice regarding Sloan's providing misinformation to Dr. Buck. Lewick testified that he read Dr. Buck's first report, in which Dr. Buck stated that his medical opinion was based upon the "medical records provided" to him by Dr. Stechschulte, Dr. Legler, and Bob Mitchell, the physical therapist. Id. at 1174; Add. at 211. In addition, Lewick testified that when he read Jones's grievance complaint in which Jones alleged that "UPS didn't want Dr. Buck's opinion" and instead wanted only the "opinion of [the] doctor related to the company," he called Sloan because he was "concerned." App. Vol. 5, at 1173-74.

After speaking with Sloan about this matter, Lewick instructed her not to speak

with Dr. Buck prior to Jones's second visit so that she would not "muddy the waters" further. Id. at 1177-78. Lewick instructed Sloan in this manner even though Lewick knew (1) that Jones had complained to the grievance panel that UPS interfered with Dr. Buck's analysis at Jones's first visit; (2) that Dr. Buck's first report was based solely on Jones's past medical reports; and (3) that the grievance panel had ordered Jones to see Dr. Buck again—this time in accordance with the CBA. Id. at 1173-76. Ignorant of the import of the grievance panel's order regarding Jones's second visit, Dr. Buck again followed Sloan's previous instructions and issued a report based only on Jones's prior medical reports.

In light of this evidence, we conclude that there was a legally sufficient factual basis for the jury to find that UPS authorized or ratified Sloan's improper behavior. Lewick himself testified that he knew of the previous medical reports releasing Jones to work and that he also knew that Dr. Legler then issued an amended report recanting his prior conclusion that Jones could return to work without restrictions. More important, Lewick was directly involved with Jones's union grievances, and as a result, he knew not only of Jones's complaint regarding UPS's interference, but also that Dr. Buck had issued a report based solely on Jones's prior medical records. Knowing this, and knowing that the grievance panel instructed Jones to obtain a second opinion from Dr. Buck, he instructed Sloan not to speak with Dr. Buck further. While we recognize that it could potentially be argued that Lewick's instruction that Sloan not speak with Dr. Buck was not made in an attempt to prevent Jones from obtaining a fair evaluation, we can only

-22-

reverse a jury's finding "if the evidence points but one way." <u>Baty</u>, 172 F.3d at 1241. In this case, based on the evidence presented, there is a sufficient factual basis to support the jury's finding that UPS authorized or ratified Sloan's conduct. We therefore affirm the district court's denial of UPS's motion for judgment as a matter of law on Jones's request for punitive damages.

*Jury to Determine Amount of Punitive Damages*

UPS argues the district court erred in permitting the jury to determine the appropriate amount of punitive damages because Kansas law requires the court to make this determination. Under Kan. Stat. Ann. § 60-3702(a), if a civil jury determines that punitive damages "shall be allowed," the state court must conduct a "separate proceeding . . . to determine the amount of . . . damages to be awarded." The district court held that § 60-3702(a) was procedural in nature, applied federal law regarding punitive damages, and submitted this issue to the jury. See <u>Pac. Mut. Life Ins. Co. v. Haslip</u>, 499 U.S. 1, 16 (1991) (holding that under federal common law, juries determined issues relating to punitive damages). Because this issue involves only questions of law, we review the district court's decision de novo. <u>Wolfgang v. Mid-Am. Motorsports, Inc.</u>, 111 F.3d 1515, 1524 (10th Cir. 1997).

"When a situation is covered by one of the Federal Rules . . . the court has been instructed to apply the Federal Rule, and can refuse to do so only if the Advisory Committee, this Court, and Congress erred in their prima facie judgment that the Rule in question transgresses neither the terms of the Enabling Act nor constitutional

-23-

restrictions." Hanna v. Plumer, 380 U.S. 460, 471 (1965). Absent any conflicting constitutional requirements, federal statutes or Federal Rules of Civil Procedure, a federal district court sitting in diversity applies federal procedural law and state substantive law. Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 427, 428 n.7 (1996).

Applying the Erie doctrine, the district court held that § 60-3702(a) was not substantive, but rather procedural in nature. The court reasoned that applying federal procedural law and submitting the punitive damages issue to the jury would not cause future plaintiffs to bring their claims in federal court instead of state court. The district court further held that while "many believe that juries are far more likely than judges to go overboard and render 'big' punitive damage awards," it had not seen any persuasive evidence in support of this theory. App. Vol. 2, at 615. After determining that § 60-3702(a) was procedural, the district court followed Erie and applied federal procedural law by instructing the jury to determine the appropriate amount of punitive damages.


Rule 38 of the Federal Rules of Civil Procedure addresses the right to a trial by jury, and that Rule controls here. Rule 38 states: "The right of trial by jury as declared by the Seventh Amendment to the Constitution . . . is preserved to the parties inviolate." Fed. R. Civ. P. 38(a). The Seventh Amendment provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." U.S. Const. amend. VII. The Seventh Amendment "governs proceedings in federal court, but not in state court." Gasperini, 518 U.S. at 418.

-24-

In Shady Grove, the Supreme Court set out a framework for determining when to apply a federal rule that appears to conflict with state law. "The framework for our decision is familiar. We must first determine whether [the rule] answers the question in dispute. If it does, it governs—[state] law notwithstanding—unless it exceeds statutory authorization or Congress's rulemaking power. We do not wade into Erie's murky waters unless the federal rule is inapplicable or invalid." Shady Grove Orthopedic Assoc., P.A. v. Allstate, 130 S. Ct. 1431, 1437 (2010). If a federal rule applies, we need not embark upon an analysis of the state's purpose in passing the conflicting state law. Id. at 1441-42.

Whether Rule 38 meets the first requirement of Shady Grove, that the Rule "answers the question in dispute," depends on the scope of the Seventh Amendment. Shady Grove, 130 S. Ct. at 1437. "The Seventh Amendment is silent on the question whether a jury must determine the remedy in a trial in which it must determine liability." Tull v. United States, 481 U.S. 412, 425-26 (1987). Therefore, in determining whether the Amendment requires a jury to decide the amount of punitive damages (or for that matter, if a jury must decide any issue), courts must determine "whether the jury must shoulder this responsibility as necessary to preserve the substance of the common-law right of trial by jury." Id. at 426 (quoting Colgrove v. Battin, 413 U.S. 149, 157 (1973) (internal quotation marks omitted)).

The Supreme Court has indicated that litigants have a Seventh Amendment right to have federal juries determine whether punitive damages should be awarded. In Curtis v.

-25-

Loether, for example, the Court held it was improper under the Seventh Amendment for a district court to award punitive damages to a plaintiff asserting a claim under the Civil Rights Act. 415 U.S. 189, 191 (1974). The Court held that a jury should have made this determination because lawsuits seeking "actual and punitive damages . . . are traditional form[s] of relief offered in the courts of law." Id. at 196. We note that the Court did not specifically hold that a jury must determine the amount of a punitive damage award; instead, it held that plaintiffs have a Seventh Amendment right to a jury trial when they seek punitive damages. See id. Nonetheless, given the Court's clear holding that there exists a common law right to a jury determination regarding punitive damages, Curtis suggests that juries must also determine the amount of punitive damage awards. See Capital Solutions, LLC v. Konica Minolta Bus. Solutions U.S.A., Inc., 695 F. Supp. 2d 1149, 1153 (D. Kan. 2010) (holding that "Curtis suggests that the amount of punitive damages is a question for the jury under the Seventh Amendment").

The Supreme Court's decision in Pacific Mutual Life Insurance Co. v. Haslip compels a similar conclusion. In that case, the Supreme Court upheld a large punitive damage verdict against an insurance company for acting in bad faith. 499 U.S. 1, 15-16 (1991). In doing so, the Court noted that "[u]nder the traditional common law approach, the amount of the punitive damage award is initially determined by a jury instructed to consider the gravity of the wrong and the need to deter similar wrongful conduct." Id. at 15. Emphasizing the historical underpinnings of this right, the Court further held that decisions regarding the amount of punitive damages "ha[ve] been always left to the

discretion of the jury" and that it "more than once has approved the common-law method for assessing punitive damages." Id. at 16 (citation omitted).

In addition to this Supreme Court precedent, this court has previously held that the Seventh Amendment protects a federal plaintiff's right to have a jury determine the amount of a punitive damage award. In O'Gilvie v. International Playtex, Inc., the district court reduced a punitive damage verdict, awarded by a jury, from $10 million to under $1.5 million. 821 F.2d 1438, 1440 (10th Cir. 1987). We held that the district court erred in doing so because it did not obtain the plaintiff's consent prior to the remittitur. Id. at 1447. We observed that "in an ordinary remittitur case, the plaintiff must be offered a choice between a new trial and accepting a remittitur to avoid a serious problem under the Seventh Amendment, which reserves to the jury the determination of damages." Id. (citations omitted); see also Defender Indus., Inc. v. Nw. Mut. Life. Ins. Co., 938 F.2d 502, 506-07 (4th Cir. 1991).

Despite Supreme Court precedent and our ruling in O'Gilvie, UPS argues that the Seventh Amendment permits courts to determine punitive damage awards. UPS first directs our attention to Cooper Industries, Inc. v. Leatherman Tool Group, Inc., in which the Supreme Court held that appellate courts reviewing district court rulings regarding punitive damage awards must do so under a de novo standard. 532 U.S. 424, 436 (2001). The Court noted that this holding does not implicate the Seventh Amendment because a jury's award of punitive damages is not really a "fact" that is "tried" by the jury. Id. at 437. Moreover, the Court observed, appellate review of punitive damage awards focuses

-27-

on due process concerns, not the right to a trial by a jury.  Id.

UPS argues that because the <u>Cooper</u> Court held that the amount of a punitive damage award is not a factual determination, this issue is beyond the scope of the Seventh Amendment and may be decided by a court.  Not only do we disagree with this argument, but also we conclude that <u>Cooper</u> actually supports Jones's position regarding the unconstitutionality of § 60-3702(a) when applied in federal court.  UPS's reliance on <u>Cooper</u> is misplaced because the Court's decision was based on the "re-examination clause" of the Seventh Amendment, not the "trial by jury clause."  532 U.S. at 437 n.11.  In <u>Cooper</u>, the Court noted that while it had previously held that "'it is the peculiar function *of the jury* to' set the amount of punitive damages," <u>id.</u> (quoting <u>Barry v. Edmunds</u>, 116 U.S. 550, 565 (1886) (emphasis added)), this did not mean that "the amount of punitive damages imposed by the jury is itself a "fact" within the meaning of the Seventh Amendment's Reexamination Clause."  <u>Id.</u>

UPS also claims the Court's decision in <u>Tull v. United States</u> supports its argument.  In <u>Tull</u>, a real estate developer alleged that the district court violated his Seventh Amendment rights when it denied his request for a jury trial in a claim for civil penalties brought against him by the government under the Clean Water Act.  481 U.S. 412, 415-16 (1987).  The Court disagreed and held that the Seventh Amendment does not entitle defendants to jury trials in claims for civil penalties brought against them under the Clean Water Act.  <u>Id.</u> at 426.  The Court reasoned that because an "action to recover civil penalties usually seeks the amount fixed by Congress," it is not necessary to have a jury

-28-

determine the "assessment of a civil penalty" in order "to preserve the substance of the common-law right of trial by jury." Id. (quotation and citation omitted). The Court further observed that "[s]ince Congress itself may fix the civil penalties, it may delegate that determination to trial judges." Id. at 427.

We disagree with UPS's assertion that Tull stands for the proposition that courts are permitted to determine the amount of punitive damage awards in cases like the one presently presented. In Feltner v. Columbia Pictures Television, Inc., the Court clarified any potential uncertainty created by Tull. In Feltner, the Court held that a claim for statutory damages under the Copyright Act carried with it a right to a jury trial because "there [was] historical evidence that cases involving discretionary monetary relief were tried before juries." 523 U.S. 340, 353 (1998). The Court further held that "[t]he right to a jury trial includes the right to have a jury determine the *amount* of statutory damages, if any, awarded to the copyright owner." Id. (emphasis in original). In so holding, the Court rejected the argument that Tull required courts to determine statutory damage awards. The Court noted that in Tull, it was "presented with no evidence that juries historically had determined the amount of civil penalties to be paid to the [g]overnment," while in Feltner there was "clear and direct historical evidence that juries, both as a general matter and in copyright cases, set the amount of damages awarded to a successful plaintiff." Id. at 354-55.

The Supreme Court has repeatedly affirmed the historical nature of the Seventh Amendment right to a trial by jury in federal cases involving punitive damages. Its

-29-

decisions, taken together, indicate that this right includes the right to a jury determination regarding the amount of punitive damages. See Capital Solutions, 695 F. Supp. 2d at 1152 (holding that "the Seventh Amendment does require that the jury also be allowed to determine the amount of any punitive damages awarded"). Rule 38, by preserving "the right to a trial by jury as declared by the Seventh Amendment," answers the question in dispute and requires that the jury determine the amount of the punitive damage award in federal court, despite conflicting state law. Thus, Rule 38 satisfies the first part of the Shady Grove test.

Rule 38 also satisfies the second Shady Grove requirement, that it not, "exceed[] statutory authorization or Congress's rulemaking power." Shady Grove, 130 S. Ct. at 1437. The Rule, which in relevant part merely incorporates an amendment to the Constitution, does not exceed Congress's rulemaking power. In testing whether Rule 38 "exceeds statutory authorization," we measure it against the Rules Enabling Act. In the Rules Enabling Act, Congress authorized the Supreme Court to promulgate rules of procedure subject to its review, with the limitation that those rules "shall not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(a). "The test must be whether a rule really regulates procedure,—the judicial process for enforcing rights and duties recognized by substantive law and for justly administering remedy and redress for disregard or infraction of them." Sibbach v. Wilson & Co., 312 U.S. 1, 14 (1941); see also Shady Grove, 130 S. Ct. at 1442. We do not look to the purpose of the conflicting state law, but rather we look to Rule 38 itself; the purpose of the state law, even if

substantive, is immaterial to our analysis. <u>Shady Grove</u>, 130 S. Ct. at 1441-42. Rule 38 governs procedure. It determines only who will serve as fact finder in federal cases, not what law will apply to those facts. While application of Rule 38 may affect, to some degree, the outcome of this litigation, that possibility does not preclude the Rule's application. "To hold that a Federal Rule of Civil Procedure must cease to function whenever it alters the mode of enforcing state-created rights would be to disembowel either the Constitution's grant of power over federal procedure or Congress' attempt to exercise that power in the Enabling Act." <u>Hanna</u>, 380 U.S. at 473-474. Here, Rule 38 regulates only the procedure used to enforce a state-created right, and thus it is a procedural rule, authorized by the Rules Enabling Act.

Thus, because the Rule answers the question in dispute, and because it does not exceed the Rule Enabling Act's authorization or Congress's rulemaking power, Rule 38 controls. <u>Shady Grove</u>, 130 S. Ct. at 1437. We therefore affirm the district court's denial of UPS's motion for a new trial on this ground.[7]

*The Amount of Punitive Damages*

Finally, UPS argues the district court erred when it held that the jury's $2 million

___

[7] While neither Jones nor UPS argued that a federal statute or federal rule controls the issue of whether the district court erred in instructing the jury to determine the size of the punitive damage award, both parties provided extensive briefing on the applicability of the Seventh Amendment. "We may uphold the district court's decision . . . under any ground that the record supports." <u>United States v. Flower</u>, 29 F.3d 530, 536 n.9 (10th Cir. 1994). <u>See</u> <u>Stewart</u>, 487 U.S. at 25 (affirming Eleventh Circuit's choice-of-law decision "under somewhat different reasoning").

punitive damage award did not violate its federal due process rights.  We review the

district court's determination of the constitutionality of an award of punitive damages de

novo.  Cooper, 532 U.S. at 424.

"[T]he Due Process Clause of the Fourteenth Amendment prohibits the imposition

of grossly excessive or arbitrary punishments on a tortfeasor."  Hardman v. City of

Albuquerque, 377 F.3d 1106, 1121 (10th Cir. 2004) (internal quotation marks and

alteration omitted).  "In analyzing the constitutionality of punitive damages, the Supreme

Court has instructed courts to look to (1) the degree of reprehensibility of the defendant's

action; (2) the disparity between the actual harm suffered by the plaintiff and the punitive

damage award; and (3) the difference between the punitive damage award and the civil

penalties authorized or imposed in comparable cases."  Id. (citing BMW of N. Am., Inc.

v. Gore, 517 U.S. 559, 574-75 (1996)).  We will address these three factors in light of the

facts of this case.

*1.     Degree of Reprehensibility*

The degree of reprehensibility of the defendant's conduct is "the most important

indicium of the reasonableness of a punitive damages award."  Gore, 517 U.S. at 575.  In

addressing this issue, courts are to consider the following: (1) whether the harm caused

was physical as opposed to economic; (2) whether the defendant acted with indifference

or a reckless disregard for the health or safety of others; (3) the financial vulnerability of

the plaintiff; (4) whether the defendant's wrongful conduct involved repeated actions or

was an isolated incident; and (5) whether the harm was the result of intentional malice,

trickery, or deceit, or mere accident.  State Farm Mut. Auto. Ins. Co. v. Campbell, 538

U.S. 408, 419 (2003).

Although it is a close question, these five factors weigh in favor of finding that the

jury's $2 million punitive damage award was excessive.  We are persuaded primarily by

the fact that Sloan's conduct resulted solely in economic injury to Jones and that Sloan

did not act with disregard for the health and safety of others.  We recognize that Sloan

attempted on multiple occasions to prevent Jones from returning to work and that her

conduct was both wilful and improper.  We reiterate that it is for this reason that we

uphold the jury's decision to award punitive damages in this case.  Nonetheless, given the

factors set forth by the Supreme Court, we conclude that Sloan's conduct was not so

reprehensible as to warrant a $2 million punitive damage award.

2.      *Disparity between Actual and Punitive Damages*

The Supreme Court has held that "[t]he precise award" of punitive damages "must

be based upon the facts and circumstances of the defendant's conduct and the harm to the

plaintiff."  Id. at 425.  For this reason, the Court has been "reluctant to identify concrete

constitutional limits on the ratio between harm . . . to the plaintiff and the punitive

damages award."  Id. at 424 (citation omitted).  The Court's "jurisprudence [does]

demonstrate[], however, that, in practice, few awards exceeding a single digit-ratio

between punitive and compensatory damages, to a significant degree, will satisfy due

process."  Id. at 425.  Moreover, "an award of more than four times the amount of

compensatory damages might be close to the line of constitutional impropriety."  Id.

(citing Haslip, 499 U.S. at 23-24).  Nonetheless, the Court has made clear that the amount

of compensatory damages awarded plays a role in determining whether a punitive damage

award is appropriate.  "When compensatory damages are substantial, then a lesser ratio,

perhaps only equal to compensatory damages, can reach the outermost limit of the due

process guarantee."  Id.

UPS argues that because the jury's award of $630,307 in actual damages was

substantial, its $2 million punitive damages verdict was excessive under the Fourteenth

Amendment.  We agree.  Although the overall ratio of actual to punitive damages in this

case probably does not push the boundaries of due process requirements, the jury awarded

Jones a substantial compensatory damage award in light of the injuries he suffered.

Given his substantial recovery of compensatory damages, we conclude that the jury's

punitive damage award was grossly excessive and therefore in violation of UPS' due

process rights.

3.      *Comparable Cases*

A review of comparable employment cases supports our conclusion that the jury's

punitive damage award was excessive.  For example, in Morgan v. New York Life

Insurance a jury awarded a former insurance company executive $6 million in

compensatory damages and $10 million in actual damages in his age discrimination

lawsuit against his former company.  559 F.3d 425, 428 (6th Cir. 2009).  The Sixth

Circuit, citing the Supreme Court's decision in Campbell v. State Farm, determined that

the jury's compensatory damage award was substantial and that the $10 million punitive

-34-

damage award therefore violated the insurance company's due process rights. Id. at 442.

In Watson v. E.S. Sutton, Inc., another analogous case, a corporation appealed a jury verdict awarding a former employee over $2 million in compensatory and punitive damages after finding that the corporation unlawfully retaliated against her. 225 F. App'x 3, 4 (2nd Cir. 2006). Applying the three factor test set forth in Campbell, the Second Circuit upheld the jury's punitive damage award, noting that it was only "half the size of the compensatory damages award." Id. at 5.

We also note that outside of the employment arena, courts have struck down large punitive damage awards when compensatory damages have been substantial. See Mendez-Matos v. Municipality of Guaynabo, 557 F.3d 36, 55 (1st Cir. 2008) (striking down a $350,000 punitive damage award in a § 1983 case because the $35,000 compensatory damage award "amply compensated" the plaintiff); Bridgeport Music, Inc. v. Justin Combs Publ'g, 507 F.3d 470, 488-89 (6th Cir. 2007) (overturning a punitive damage award of $3.5 million in a copyright infringement case when the plaintiff received a "substantial" compensatory award of $366,939); Boerner v. Brown & Williamson Tobacco Co., 394 F.3d 594, 603 (8th Cir. 2005) (striking down a punitive damage award of $15 million in a design defect case because the plaintiff received a "substantial" compensatory damage award of over $4 million).

In conclusion, having considered the degree of reprehensibility, the size of the punitive damage award compared to the compensatory damage award, and comparable cases, we conclude that the jury's award of $2 million was constitutionally excessive. We

therefore reverse the judgment of the district court. Based on these factors, and relying

on the Supreme Court's statement in State Farm Mut. that "[w]hen compensatory

damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages,

can reach the outermost limit of the due process guarantee," 538 U.S. at 425, we

determine that a punitive damage award equal to the compensatory damage award is the

maximum constitutionally allowable award under these particular facts. See Continental

Trend Resources, Inc. v OXY USA Inc., 101 F.3d 634, 642 (10th Cir. 1996) (determining

the maximum constitutionally permissible punitive award based on our review of the

record). We remand for the district court to enter a punitive damage award equal to the

compensatory damage award.[8]

### III

The judgment of the district court is AFFIRMED in part and REVERSED in part

as follows:

The district court's denial of UPS's motion for judgment as a matter of law is

AFFIRMED.

---

[8] We need not permit Jones to choose between a new jury trial or acceptance of the remittitur because, unlike the reduction in O'Gilvie, 821 F.2d at 1440, 1447, this reduction is required by the constitution, not a court's determination as to whether substantial evidence at trial supported the amount awarded. OXY USA Inc., 101 F.3d at 642-42 (holding that a reduction in punitive damages to comply with the Due Process Clause is "a federal constitutional issue," not a fact issue requiring jury consideration). Moreover, the Supreme Court has held that "appellate review of the district court's determination that an award is consistent with due process does not implicate the Seventh Amendment concerns." Cooper Industries, Inc., 532 U.S. at 437.

The district court's denial of UPS's motion for a new trial based on improper jury instructions and submission of the amount of damages to the jury is AFFIRMED.

The district court's denial of UPS's motion for a new trial regarding the amount of punitive damages is REVERSED and REMANDED for the limited purpose of entering a punitive damage award equal to the compensatory damage award.

09-3275 - *Jones v. United Parcel Service, Inc.*

**HARTZ**, Circuit Judge, dissenting:

I respectfully dissent from the affirmance of the punitive-damages award. I do not believe that a reasonable jury could have found by clear and convincing evidence that UPS authorized or ratified Sloan's retaliation. In addition, I write separately to express my disagreement with UPS's argument on an issue that has divided the district judges in Kansas but is not addressed by the majority opinion— namely, the argument that Kan. Stat. Ann. § 60-3702(a) is procedural for purposes of the *Erie* doctrine. I would hold that state statutes allocating decision-making to a judge rather than a jury "are prototypical procedural rules," *Schriro v. Summerlin*, 542 U.S. 348, 353 (2004), and therefore are superseded by federal law in federal-court trials.

### Sufficiency of the Evidence

Although I am not dissenting from the panel decision affirming the verdict that Sloan retaliated against Jones for filing a workers' compensation claim, the evidentiary support for the verdict is thin. My particular concern is the element of causation—that is, whether Sloan's misconduct was motivated by Jones's having filed a workers' compensation claim. The majority opinion agrees with Jones that causation is shown by the "close temporal proximity between the filing of [his] workers' compensation claim . . . and the onset of UPS's retaliatory conduct against [him]." Op. at 12 (internal quotation marks omitted); *see id.* at 13. But Jones filed his workers' compensation claim by mid-November 2003, and there is no allegation of any wrongdoing by Sloan before she received Dr. Legler's report of his February 9, 2004, examination—a temporal

proximity of about three months. Our precedents suggests that this is too long a period from which to infer causation absent other evidence. *See Trujillo v. PacifiCorp*, 524 F.3d 1149, 1157 n.5 (10th Cir. 2008) (collecting cases). The majority makes no attempt to distinguish those precedents; although it sets forth evidence that Sloan engaged in misconduct, it does not explain how that misconduct suggests that the motive for the misconduct was retaliation for filing the workers' compensation claim.

Still, out of great deference to the jury, I can accept the verdict on liability. But that is as far as deference can take me. It is one thing to say that the jury, based upon all the evidence at trial, could infer—under a preponderance-of-the-evidence standard—that Sloan was acting in retaliation for Jones's having filed a compensation claim. It is quite another to say that the jury could infer—under a clear-and-convincing standard—not only that Jones was retaliating but also that Lewick (1) knew that Sloan had engaged in misconduct, (2) knew that Sloan's motive was retaliation for the workers' compensation claim, and (3) approved of and ratified both the misconduct and the motive.

The evidence relied on by the majority opinion is inadequate to support the necessary inference. As labor manager for UPS, Lewick handled 35 to 50 grievances per week. Jones's first grievance contended that he should be returned to work because both his personal physician and a UPS physician, Dr. Legler, had released him to return to work. Dr. Legler, however, had amended the release and imposed permanent restrictions. Under the collective-bargaining agreement (CBA) between UPS and the Teamsters Union, the parties are to agree on a third doctor to perform an examination when the

personal physician and the UPS physician disagree. The arbitration panel provided by the CBA heard Jones's grievance and adopted Lewick's position, ordering the parties to enter the third-doctor procedure. Lewick and the Union representative both struck names from a list of doctors, ultimately selecting Dr. Buck. Lewick testified that once the doctor is selected, UPS is to arrange an appointment for the employee to see the doctor, but is not to communicate anything about what the doctor is supposed to do. Up to the time of Dr. Buck's examination of Jones, there is no evidence that Lewick knew of any wrongdoing by Sloan, so he could hardly have ratified it.

After Dr. Buck issued his report, Jones filed another grievance, this time complaining that UPS had improperly interfered with the third-doctor procedure by refusing to authorize Dr. Buck to order a functional-capacity examination (FCE). When Lewick received the grievance, he contacted Sloan because he was concerned about the failure to approve an FCE. He testified that Sloan told him that she had simply informed Dr. Buck that there had been an earlier FCE. In any event, Jones's second grievance was upheld by the arbitration panel, and a second third-doctor exam was ordered. The selection of Dr. Buck to conduct the second examination was not preordained. According to Lewick's testimony, the parties did not strike names from a list on the second go-round because the Union business agent told Lewick that Jones requested Dr. Buck.

There is no evidence that Lewick authorized or ratified Sloan's conversation with Dr. Buck by anything he said or did during the second grievance proceeding. What the majority opinion relies on for ratification is Lewick's instruction to Sloan not to talk to

-3-

Dr. Buck before he conducted his second examination of Jones, four months after the first examination.  The majority's theory is that a rational jury could infer that Lewick wanted Dr. Buck to continue to be misinformed about what he could do.

In my view, however, a rational jury could not draw that inference by clear and convincing evidence.[1]  The jury was instructed that "[t]o be clear and convincing, evidence should be 'clear' in the sense that it is certain, plain to the understanding, and unambiguous, and 'convincing' in the sense that it is so reasonable and persuasive as to cause you to believe it."  Aplt. App., Vol. I at 136 (Doc. 145, Instruction No. 13).  There

---

[1]In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254–55 (1986), the Court held that the clear-and-convincing-evidence standard must be considered in determining whether summary judgment was appropriate.  The rationale for that decision indicates that we must likewise consider that standard in determining the sufficiency of the evidence to support a jury verdict.  The Court wrote:

> [I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden.  This conclusion is mandated by the nature of this determination.  The question here is whether a jury could reasonably find *either* that the plaintiff proved his case by the quality and quantity of evidence required by the governing law *or* that he did not.  Whether a jury could reasonably find for either party, however, cannot be defined except by the criteria governing what evidence would enable the jury to find for either the plaintiff or the defendant:  It makes no sense to say the jury could reasonably find for either party without some benchmark as to what standards govern its deliberations and within what boundaries its ultimate decision must fall, and these standards and boundaries are in fact provided by the applicable evidentiary standards.

*Id.  See Applied Genetics Int'l, Inc. v.  First Affiliated Sec., Inc.*, 912 F.2d 1238, 1244 (10th Cir. 1990) (summary judgment for defendants had been appropriate in part "[b]ecause of the high standard of proof"—clear and convincing evidence— required for a fraud claim.)

is nothing "certain," "plain to the understanding," or "unambiguous" about the inference that Lewick wished Dr. Buck to be misinformed. To begin with, there is no evidence to contradict, or undermine in any way, Lewick's testimony that he believed the third-doctor procedure prohibited any communication by UPS to the doctor except to set an appointment. Moreover, one would expect Jones to inform Dr. Buck of the reason for the repeated visit—Sloan's improperly telling Dr. Buck not to order a functional evaluation. Silence by UPS would therefore mean that Dr. Buck would hear only from Jones what the purpose of the examination was and why it was ordered. Indeed, it is baffling why Jones did not so inform Dr. Buck. Perhaps one could speculate that Lewick was so clever and insightful that he predicted that Jones would not explain his visit to Dr. Buck and that Dr. Buck would not make any further inquiry. But no rational person could find that this was plainly, certainly, or unambiguously Lewick's plan. I should add that the theory expressed in the majority opinion (that Lewick ratified Sloan's retaliation by telling her not to contact Dr. Bush) was not raised by Jones at trial or in his appellate briefs. In sum, I would reverse the award of punitive damages.

## The Kansas Statute Is Procedural

Although I believe that there was insufficient evidence to support the award of punitive damages and that it is therefore unnecessary to reach the other punitive-damages issues raised in this case, I will address one of the issues briefed by UPS because it has divided the very capable district judges in Kansas and additional analysis may be helpful. In my view, the Kansas statute that delegates to the judge, rather than the jury, the

assessment of the amount of punitive damages is a procedural rule, not a substantive one, for purposes of the *Erie* doctrine, and therefore must yield to a contrary federal rule in federal-court trials.

In *Schriro* the Supreme Court considered the retroactivity of its decision in *Ring v. Arizona*, 536 U.S. 584 (2002), which had held that in a death-penalty proceeding the existence of an aggravating factor must be proved to a jury, rather than the judge. The Court held that *Ring* did not apply retroactively because it was procedural (and was not a "watershed" procedural rule entitled to retroactive effect). In support, it said that under the *Erie* doctrine it had ruled that allocation of decisionmaking authority is a procedural matter. The Court wrote:

> *Ring* altered the range of permissible methods for determining whether a defendant's conduct is punishable by death, requiring that a jury rather than the judge find the essential facts bearing on punishment. *Rules that allocate decisionmaking authority* in this fashion *are prototypical procedural rules*, a conclusion we have reached in numerous other contexts. *See Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 426 (1996) (*Erie* doctrine) . . . .

542 U.S. at 353 (emphasis added).

The *Erie*-doctrine opinion cited by the Court—*Gasperini*—is a complicated one. But it is worth summarizing to show its relevance here. *Gasperini* was a diversity case in which the plaintiff sought damages for the loss of some photographic transparencies. The New York statute at issue empowered the New York Appellate Division "to review the size of jury verdicts and to order new trials when the jury's award deviates materially from what would be reasonable compensation." *Gasperini*, 518 U.S. at 418 (internal

quotation marks omitted).  The question was whether the state statute should apply in whole or in part in federal court.  The Supreme Court analyzed the statute as containing two components.  First, the statute set a limit on punitive-damages awards—an award could not depart too far from reasonable compensation.  The Court considered this component of the law to be the functional equivalent of a statutory cap on damages, "differ[ing] from a statutory cap principally in that the maximum amount recoverable is not set forth by statute, but rather is determined by state law."  *Id.* at 429 (internal quotation marks omitted).  The second component of the law assigned the task of applying that limit to the state intermediate appellate court.  Thus, on the page of *Gasperini* cited by *Schriro*, the Court wrote that the New York statute:

> appraised under [*Erie*] and decisions in *Erie*'s path, is both 'substantive' and 'procedural':  'substantive' in that [the statute's] 'deviates materially' standard controls how much a plaintiff can be awarded; 'procedural' in that [the statute] assigns decisionmaking authority to New York's Appellate Division. . . .  The dispositive question . . . is whether federal courts can give effect to the substantive thrust of [the statute] without untoward alteration of the federal scheme for the trial and decision of civil cases.

*Id.* at 426.

The Court's holding in *Gasperini* was twofold:  It upheld the application in federal court of the substantive component—the cap on punitive damages; but it refused to uphold the application of the procedural component—the assignment to the appellate court of determining whether the award deviated materially from reasonable compensation.  Under federal law, it said, the role of the federal appellate court was limited to determining whether the district court's decision, either to uphold the jury

-7-

award or to set it aside and require a new trial (because the award deviated materially), was an abuse of discretion. *See id.* at 437–39. To comply with federal procedural law, the federal district court would make the deviated-materially determination, and the circuit court would decide only whether that determination was an abuse of discretion. Thus, as noted in *Schriro*, *Gasperini* held that federal law governed the allocation of decision-making authority between the trial and appellate courts because such allocation rules are procedural. Applying *Gasperin*i to this case, it is clear that what we have is a question of the allocation of decision-making authority—whether the court or the jury determines the amount of punitive damages—which is a procedural matter governed by federal law. The Kansas statute does not impose a cap on punitive damages or its functional equivalent, so *Gasperini*'s holding on the substantive component of the New York statute is irrelevant.

UPS invokes the outcome-determination test of *Guaranty Trust Co. of New York v. York*, 326 U.S. 99 (1945), which is generally applied to determine, for *Erie* purposes, whether a state law is substantive or procedural. But that test is not always the applicable one. As the *Gasperini* opinion reminds us, the Supreme Court decision in *Byrd v. Blue Ridge Rural Electric Cooperative, Inc.*, 356 U.S. 525, 537 (1958), "said that the *Guaranty Trust* 'outcome-determination' test was an insufficient guide in cases presenting countervailing federal interests." *Gasperini*, 518 U.S. at 432. *Gasperini* went on to quote the following passage from *Byrd* as describing the countervailing interest in that case,

-8-

which concerned whether the federal court sitting in diversity should follow a state-law rule requiring that the issue be tried to the court:

> "The federal system is an independent system for administering justice to litigants who properly invoke its jurisdiction. An essential characteristic of that system is the manner in which, in civil common-law actions, it distributes trial functions between judge and jury and, under the influence—if not the command—of the Seventh Amendment, assigns the decisions of disputed questions of fact to the jury."

*Id.* (quoting *Byrd*, 356 U.S. at 537 (footnote omitted)). *Byrd* therefore held that, despite state law to the contrary, in federal court the issue must be tried to the jury.

I recognize that very recently Justice Scalia, writing for himself and three other members of the Court, said that in the *"Erie* . . . context, it ma[kes] no difference whether the rule [is] technically one of substance or procedure; the touchstone [is] whether it significantly affects the result of a litigation." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 130 S. Ct. 1431, 1442 (2010) (alteration and internal quotation marks omitted). But the sentence was dictum whose purpose was only to distinguish *Erie-*doctrine cases from the case before the Court, which addressed the Rules Enabling Act and the applicability of a federal rule of civil procedure in a diversity case. The sentence was not intended to capture all the subtleties of the *Erie* doctrine; elaboration was unnecessary because the *Erie* doctrine was not the issue. In particular, nothing in *Shady Grove* involved the allocation of decision-making authority between judge and jury, so the specifics of the *Erie* doctrine in that context were hardly relevant. There is no reason to think that Justice Scalia's single sentence in *Shady Grove* signaled the repudiation of

what he had written in his *Gasperini* dissent, where he considered specifically the allocation of authority between judge and jury:

> Outcome determination was never intended to serve as a talisman, and does not have the power to convert the most classic elements of the *process* of assuring that the law is observed into the substantive law itself. The right to have a jury make the findings of fact, for example, is generally thought to favor plaintiffs, and that advantage is often thought significant enough to be the basis for forum selection. But no one would argue that *Erie* confers a right to a jury in federal court wherever state courts would provide it; or that, were it not for the Seventh Amendment, *Erie* would require federal courts to dispense with the jury whenever state courts do so.

518 U.S. at 465 (citation and internal quotation marks omitted). The majority opinion in *Gasperini* said nothing to the contrary.

Returning to the language in *Schriro* that I find controlling, I would take it seriously when that opinion states that "[r]ules that allocate decisionmaking authority in this fashion [by requiring fact-finding by a jury rather than a judge] are prototypical procedural rules, a conclusion we have reached in numerous other contexts," and then cites "*Erie* doctrine" as the first "other context." 542 U.S. at 353. Until instructed otherwise by the Supreme Court, I would read its opinions as stating that the allocation of authority between a judge and a jury in diversity cases is a matter of federal law. *See* 8 James Wm. Moore et al., Moore's Federal Practice §38.14[1] (3d ed. 2011) ("The right to a jury trial in the federal courts is to be determined as a matter of federal law in diversity as well as other actions."); 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure §2303 (3d ed. 2008) ("[T]he Byrd decision establishes the proposition that

federal practice controls the scope and incidence of jury trial, even when federal practice

is not constitutionally required.").