FILED
United States Court of Appeals
Tenth Circuit

July 30, 2012

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

MARY BROWN,

      Plaintiff-Appellant,

v.

YRC INC.,

      Defendant-Appellee.

No. 11-3001
(D.C. No. 2:07-CV-02556-EFM)
(D. Kan.)

### ORDER AND JUDGMENT[*]

Before **BRISCOE**, Chief Judge, **PORFILIO**, Senior Circuit Judge, and **MURPHY**, Circuit Judge.

Mary Brown sued her former employer, YRC, Inc., alleging she was terminated because of her pregnancy. After a five-day trial, a jury returned a verdict for Ms. Brown. YRC then renewed its motion for judgment as a matter of law (JMOL), which the district court granted. Exercising jurisdiction under 28 U.S.C.

---

[*]    After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

§ 1291, we reverse the district court's judgment in YRC's favor, reinstate the jury's verdict in Ms. Brown's favor, and remand for a determination of attorney's fees.

## I.  Background[1]

On Friday, November 17, 2006, Ms. Brown was offered a Human Resources (HR) Specialist position in YRC's Kansas headquarters.  She was about three months pregnant at the time, but no one at YRC knew she was expecting.  Before accepting, she emailed Stacy Beecher, the HR Supervisor who had extended the offer, to inform her that she was pregnant and inquire about benefits.  In part, Ms. Brown's November 18 email stated:

> [T]here is one thing that I wanted to make sure that we discussed. . . .  I am due to have a baby around May 28, 2007.  I think that you will find me to be a dedicated employee who asks for little time off . . . .  However, I will want to take some time to be with the baby when it arrives.  I would expect that this time would be unpaid and would be more than happy to do any necessary work from home. I realize that this is a sensitive issue but I would not feel comfortable accepting unless I was sure that this would not later inconvenience the department.

Aplt. App. at 1892.

Unbeknownst to Ms. Brown, the busy season for YRC's HR Specialists begins in May and runs through August.  No one from YRC responded to Ms. Brown's email on or before Wednesday, November 22, the day on which Ms. Beecher had asked Ms. Brown to provide an answer.  When Ms. Brown did accept the position,

---

[1]     In reviewing the district court's grant of JMOL after an adverse jury verdict, we "construe the facts of the case in the light most favorable to" Ms. Brown. *Crumpacker v. Kan. Dep't of Human Res.*, 474 F.3d 747, 751 (10th Cir. 2007).

and again asked about benefits, Ms. Beecher replied: "That is great Mary. . . . We need to discuss a start date . . . . Please let me know what you are thinking . . . . " *Id.* at 1898. Ms. Beecher's response to Ms. Brown did not answer any of her questions about benefits.

On December 4, 2006, Ms. Brown began her brief employment with YRC as an HR Specialist. HR Specialists in the Kansas headquarters support YRC's in-the-field HR Managers by assisting with the hiring process in each of the company's various geographic regions. That is, although an HR Specialist is physically located in the company's headquarters, her job is to assist an HR Manager physically located in the region to which she is assigned.

Ms. Beecher initially planned to have Ms. Brown take over YRC's Phoenix region on January 1, 2007. Ms. Beecher told her that some of the HR Specialists trained independently, but she also indicated that Shannon Bahre, the HR Specialist who was then covering the Phoenix region, would be training her. Around December 18, Ms. Brown began working with Don Pochowski, the Phoenix region's in-the-field HR Manager.

On Friday, December 22, Ms. Beecher's boss, Lindsay Jordan, met with Ms. Bahre, ostensibly to discuss Ms. Brown's training progress.[2] In the meeting,

---

[2] Ms. Jordan is a licensed attorney who employs her legal training to determine what documentation should be used to support an employee's termination. And, according to two of Ms. Jordan's subordinates, documenting is "what we do" in HR. Aplt. App. at 547, 857.

Ms. Jordan asked Ms. Bahre to send her something in writing describing Ms. Brown's shortcomings. Ms. Bahre (a subordinate of both Ms. Jordan and Ms. Beecher) sent an email to Ms. Jordan that began "[p]er our conversation, here are the factual things I can say" about Ms. Brown's training progress. Aplt. App. at 1998. Ms. Bahre's message contained a six-item list of perceived problems, including: takes few notes; repeatedly asks questions about the same and basic processes, thereby "indicating a limited understanding of the big picture"; and is not receptive to our training process. *Id.* Ms. Jordan met with Ms. Brown later the same day, but she did not mention any of Ms. Bahre's concerns. Ms. Jordan did, however, forward Ms. Bahre's email to Ms. Beecher, adding that she was unsure Ms. Brown was getting "the big picture." *Id.* at 2008. Ms. Jordan also suggested to Ms. Beecher that Ms. Brown train with Sara Bass, another HR Specialist.

The following Wednesday, December 27, Ms. Beecher and Ms. Brown met; but again, there was no discussion of Ms. Bahre's concerns. On December 28, Ms. Brown was told by Ms. Beecher that she had decided to delay handing off the Phoenix region until Monday, January 8, 2007, because her schedule would not allow her to work with Ms. Brown the week of January 1.

On Tuesday, January 2, 2007, Ms. Jordan and Ms. Beecher met with Ms. Brown to discuss her Individual Development Plan for the coming year. In it, Ms. Brown had listed her goals and objectives, some of which were related to her anticipated maternity leave. During the meeting no mention was made that anyone

- 4 -

had any concerns about Ms. Brown's training progress. But Ms. Jordan was apparently upset about Ms. Brown's upcoming leave and said something like "You're not going to be here during our busy season anyway. Why don't you just learn your job." *Id.* at 349-50 (internal quotation marks omitted). Considering Ms. Jordan's tone, Ms. Brown became concerned her maternity leave was, in fact, going to inconvenience YRC. She therefore began keeping contemporaneous notes in her calendar and forwarding emails to her home.

On January 3, Ms. Brown trained with Ms. Bass. Afterward, Ms. Brown emailed Ms. Beecher, stating that she felt confident things would go smoothly when she took over the Phoenix region. Ms. Beecher forwarded the email to Ms. Jordan, stating only "Hmmm." *Id.* at 2051. Ms. Jordan responded, without any elaboration, "I am really getting concerned about her. . . ." *Id.*

On January 4, Ms. Beecher informed Mr. Pochowski that Ms. Brown would not be taking over the Phoenix region on January 8. Ms. Beecher did not ask him about Ms. Brown's to-date performance, and he did not have any idea what prompted the decision.

On Friday, January 5, Ms. Beecher told Ms. Brown that YRC had concerns about her training progress and that she would not be taking over the Phoenix region as scheduled. This was the first time Ms. Brown was apprised of her alleged deficiencies. On Friday evening, Ms. Beecher drafted an email to Ms. Brown to memorialize their conversation. Before sending it, she sent the draft to Ms. Jordan,

asking her whether the message was "comprehensive enough." *Id.* at 2075. Ms. Jordan replied on Saturday afternoon with several modifications. In particular, Ms. Beecher's original draft included the following: "We will review your progress again and determine our next steps." *Id.* Ms. Jordan deleted that language and a reference to giving Ms. Brown "full responsibility for the [Phoenix] area." *Id.* at 2078. Ms. Jordan also added language that "independent learning ha[d] not been successful." *Id.*

On Monday morning, January 8, Ms. Beecher sent the revised email to Ms. Brown. In it, she criticized Ms. Brown for, among other things, being "indifferent to the process" and "resistant to the [YRC] way." *Id.* at 2081. Ms. Beecher also said they would work together, and she scheduled a follow-up meeting for January 10. At this point, Ms. Brown suspected that YRC had decided to terminate her employment. Notwithstanding, she promptly responded to Ms. Beecher's email, apologizing and indicating that she hoped to earn her confidence.

On Wednesday, January 10, Ms. Beecher complimented Ms. Brown, observing that Ms. Bass had reported that their training was productive. Ms. Beecher thereafter complimented Ms. Brown again, this time about a complex assignment. The next day, Ms. Brown learned that she had been nominated by Natalie Frank, another HR Specialist, for an award recognizing coworker excellence.

But on Monday, January 15, Ms. Beecher summoned Ms. Brown to Ms. Jordan's office and terminated her employment. At the time of her termination, Ms. Brown was about six months pregnant and showing.

After Ms. Brown was terminated, Ms. Bass wrote a statement titled "Progress Report," documenting perceived problems with Ms. Brown's performance. Ms. Bass emailed the document to Ms. Beecher on January 16.

After exhausting her administrative remedies and obtaining a notice of right to sue from the Equal Employment Opportunity Commission, Ms. Brown timely filed this action against YRC, alleging pregnancy discrimination in violation of Title VII, 42 U.S.C. §§ 2000e to 2000e-17, as amended by the Pregnancy Discrimination Act (PDA), *id.* § 2000e(k).[3] Since Ms. Brown sought to prove intentional discrimination through indirect proof, the district court analyzed her claim at the summary judgment stage under the familiar three-step burden-shifting framework of *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See Orr v. City of Albuquerque*, 531 F.3d 1210, 1214 (10th Cir. 2008) ("In our court, PDA claims proceed in much the same manner as other Title VII claims of disparate treatment."). At steps one and two of the *McDonnell Douglas* framework, the court concluded that Ms. Brown had established a prima facie case of pregnancy discrimination and that YRC had met its

---

[3] Title VII prohibits employment discrimination on the basis of sex. 42 U.S.C. § 2000e-2(a). The PDA amended Title VII to provide that discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions" constitutes unlawful sex discrimination under Title VII. *Id.* § 2000e(k).

burden of asserting a facially nondiscriminatory explanation for terminating Ms. Brown: she was inadequately progressing with her training. But at step three, the court concluded that genuine issues of material fact existed regarding whether YRC's proffered explanation for terminating Ms. Brown was a pretextual. Thus, the court denied YRC's motion and the case proceeded to trial.

Ms. Brown contended that once YRC learned that she was pregnant and that her maternity leave would coincide with its busy season, it no longer wanted her to accept the job. To that end, YRC ignored the inquiries she made about benefits in advance of accepting the position, in hopes that if it was silent she would either miss the November 22 deadline (while awaiting a response), or assume that benefits were not available and decline the offer. Failing that, YRC continued to withhold benefits information after Ms. Brown started working for YRC, and it sought to sabotage her training—in order to fire her on the pretense of cause—while leaving itself enough time to hire and train a new HR Specialist before the busy season started.

At the close of Ms. Brown's evidence, YRC filed a Fed. R. Civ. P. 50(a) motion for JMOL. The court took it under advisement. At the close of all evidence, the jury found that Ms. Brown had demonstrated by a preponderance of the evidence that her pregnancy was a motivating factor in YRC's decision to terminate her employment. The jury awarded Ms. Brown lost wages, lost benefits, and non-economic damages, totaling $75,500. YRC then renewed its motion for JMOL pursuant to Rule 50(b), and the district court granted it. *Brown v. Yellow Transp., Inc.*, No. 07-2556-EFM,

2010 WL 4963021 (D. Kan. Dec. 1, 2010). In doing so, the court evaluated the legal sufficiency of the evidence in a single paragraph, concluding that "the jury had nothing but unsupported speculation to support a finding of illegal discrimination," *id.* at *7 (footnote omitted). This appeal followed.

## II. Discussion

We review de novo the district court's grant of YRC's renewed motion for JMOL. *Green v. Safeway Stores, Inc.*, 98 F.3d 554, 557 (10th Cir. 1996). We consider "all of the evidence in the record," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000), construing it "in the light most favorable to the jury's verdict," *Crumpacker*, 474 F.3d at 751. Thus, we afford Ms. Brown the benefit of all reasonable inferences, keeping in mind that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves*, 530 U.S. 150 (internal quotation marks omitted). "[A] party is entitled to judgment as a matter of law *only* if all of the evidence, viewed in the light most favorable to the nonmoving party, reveals no legally sufficient evidentiary basis to find for the nonmoving party." *Jones v. United Parcel Ser., Inc.*, 674 F.3d 1187, 1195 (10th Cir.) (emphasis added) (internal quotation marks omitted), *petition for cert. filed* (U.S. July 3, 2012) (No. 11A1117, 12-27).

"[A]fter a full trial on the merits," the dispositive question for our review "is whether there was sufficient evidence presented for the jury to infer [that YRC's]

reasons" for terminating Ms. Brown's employment "were pretextual." *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1107-08 (10th Cir. 2001) (internal quotation marks omitted).

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination.

*Id.* at 1108 (internal quotation marks omitted). As discussed below, we cannot say that "the evidence points but one way and is susceptible to no reasonable inferences" supporting Ms. Brown's claim. *Jones*, 674 F.3d at 1195.

Ms. Brown asserts that she met her burden of establishing a prima facie case and presented abundant evidence of pretext. YRC counters that JMOL in its favor was proper *because* Ms. Brown did not establish a prima facie case of pregnancy discrimination. YRC misses the mark. At this point in the proceedings, we focus on whether the evidence was sufficient to establish that YRC discriminated against Ms. Brown on the basis of her pregnancy. Never mind the fact that we concur with the district court's determination that Ms. Brown established a prima facie case of discrimination under *Argo v. Blue Cross & Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1201 (10th Cir. 2006), and *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1193-94 & 1195 n.6 (10th Cir. 2000); even if she had not established a prima facie case, we would not be obligated to affirm the district court's grant of JMOL in favor of YRC. *Cf. Abuan v. Level 3 Commc'ns, Inc.*, 353 F.3d 1158, 1169

- 10 -

(10th Cir. 2003) ("[A]n appellate court's determination that a plaintiff failed to establish a prima facie case is not grounds for reversing a jury verdict . . . ."); *see also Jones*, 674 F.3d at 1196 n.3 (considering whether prima facie case was established, after a full trial on the merits, only because the court was applying Kansas law).

Accordingly, we turn to the parties' arguments concerning pretext. An employee may "show pretext by demonstrating such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons." *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1196 (10th Cir. 2011) (internal quotation marks omitted); *see also Miller v. Eby Realty Grp. L.L.C.*, 396 F.3d 1105, 1111 (10th Cir. 2005) ("Pretext exists when an employer does not honestly represent its reasons for terminating an employee.").

Ms. Brown accurately and persuasively directs this court's attention to ample evidence from which a reasonable factfinder could infer pretext. For example, despite the district court's statement that "none of Plaintiff's witnesses testified that Plaintiff was succeeding at her training," *Brown*, 2010 WL 4963021, at *7, Ms. Frank nominated Ms. Brown for a coworker excellence award in January 2007.[4] The only mention the

---

[4] YRC attempts to dispute the significance of this accolade, asserting that "Frank later found out that the project for which she nominated Plaintiff . . . was

(continued)

- 11 -

district court made of Ms. Frank was its observation that Ms. Frank "had also become pregnant on the job" but was "never made to feel that her pregnancy was an issue." *Brown*, 2010 WL 4963021, at *3. In so stating, the district court neglected to mention that Ms. Frank's pregnancy occurred after YRC was aware that Ms. Brown was pursuing a pregnancy discrimination claim.

Ms. Brown also introduced evidence that on January 2 Mr. Pochowski complimented her "good, positive and helpful guidance" to another manager in the field. Aplt. App. at 2029. Ms. Brown's supervisor, Ms. Beecher, was copied on this email. The next day, Mr. Pochowski commented that a suggestion Ms. Brown made was "Perfect!", this time copying Ms. Bahre. *Id.* at 2039. The district court made no mention of Mr. Pochowski's praise. And YRC's futile attempt to undermine his praise consists of its lifting, out of context, Mr. Pochowski's testimony that he "'knew nothing about Mary Brown's performance at all,'" Aplee. Br. at 9 (quoting Aplt. App. at 666).

"One of the primary roles of the factfinder is to assess credibility in deciding how to view the evidence." *Miller*, 396 F.3d at 1112. A reasonable factfinder could rationally accord more credence to Ms. Frank's and Mr. Pochowski's positive assessments of Ms. Brown's performance than to the negative, subjective

---

actually completed by another employee, not Plaintiff." Aplee. Br. at 10 (footnote omitted). But Ms. Frank was impeached at trial with her earlier deposition testimony that the only reason another employee completed the project was because Ms. Brown was terminated before she could finish it. A reasonable factfinder could rationally weigh this evidence in Ms. Brown's favor.

assessments provided by Ms. Bahre, Ms. Bass, and Ms. Beecher. *See Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1328 (10th Cir. 1999) ("Evidence of pretext may include . . . the use of subjective criteria."). Indeed, in deposition testimony presented to the jury, Ms. Bahre was unable to offer any specifics about Ms. Brown's alleged difficulties in training. Ms. Bass testified similarly. Ms. Beecher also failed to identify any specific concerns with Ms. Brown's performance, stating only that "she was not picking up the training." Aplt. App. at 843. The lack of specificity on the part of these three witnesses is probative of pretext. *Simms*, 165 F.3d at 1328. Moreover, the week after Ms. Brown was first notified of her alleged shortcomings, Ms. Beecher complimented Ms. Brown several times. Yet Ms. Brown was terminated days later. Ms. Beecher's compliments combined with Ms. Frank's and Mr. Pochowki's praise could lead a reasonable factfinder to rationally infer that Ms. Brown was progressing in her training but was terminated anyway.

The district court also stated that "none of Plaintiff's witnesses testified that . . . Plaintiff's training was materially different and substandard from the training that others received." *Brown*, 2010 WL 4963021, at *7. But Ms. Brown offered evidence indicating otherwise. We recite some of that evidence. Ms. Brown testified that it was suggested to her by Ms. Beecher that she train independently. Ms. Beecher testified that Ms. Brown asked to train independently, but Ms. Beecher could not recall what the steps of independent training involved. Ms. Jordan testified

- 13 -

that "there is no such thing as independent training" for an HR Specialist, and that "that wouldn't be a way we would train someone." Aplt. App. at 932. However, Ms. Jordan edited Ms. Beecher's email to Ms. Brown, so that it included language indicating that "independent learning has not been successful," *id.* at 2078. The inconsistent, contradictory testimony about independent training from Ms. Beecher and Ms. Jordan (the decision makers), could lead a reasonable factfinder to rationally infer that YRC provided Ms. Brown materially different training than it provided other HR Specialists. This is especially so when the decision makers' inconsistent testimony is viewed in combination with evidence that Ms. Brown's training totaled about fifteen hours shadowing various employees, whereas Ms. Bass, Ms. Bahre, and two other HR Specialists received quantitatively more of that type of instruction.

Finally, in its conclusory, one-paragraph analysis of the sufficiency of the evidence, the district court opined that "none of Plaintiff's witnesses testified that . . . Defendant had discriminatory intent towards pregnant employees in general []or towards Plaintiff's pregnancy in particular," *Brown*, 2010 WL 4963021, at \*7. This assertion ignores testimony from which a reasonable factfinder could rationally infer a discriminatory animus, in particular, Ms. Jordan's statement that Ms. Brown should "just learn [her] job" since she would be on maternity leave "during [YRC's] busy season anyway," Aplt. App. at 349-50 (internal quotation marks omitted). *See Laxton v. Gap Inc.*, 333 F.3d 572, 583 (5th Cir. 2003) ("An oral statement exhibiting discriminatory animus may be used to demonstrate pretext or . . . as

- 14 -

additional evidence of discrimination."). Further, YRC terminated Ms. Brown's employment less than two weeks after Ms. Jordan expressed her aggravation with Ms. Brown's maternity leave. *See Annett v. Univ. of Kan.*, 371 F.3d 1233, 1241 (10th Cir. 2004) (stating that temporal proximity combined with other factors may properly lead a reasonable factfinder to "rationally find" an employer's proffered explanation "unworthy of credence").

In response, YRC argues that the district court's grant of JMOL in its favor was proper because Ms. Brown did not demonstrate that YRC's proffered reason for her termination was pretextual. But in the face of substantial evidence of pretext, YRC ignores the lens through which the evidence must be viewed; misconstrues some of that evidence; and, in support of its position, relies only on unpublished decisions. *See* Aplee. Br. at 27-29. Similarly, in granting YRC's motion for JMOL after an adverse jury verdict, the district court failed to draw all reasonable inferences in Ms. Brown's favor, ignored evidence favorable to her, and substituted its judgment concerning the weight of the evidence for the jury's. *See, e.g.*, *Brown*, 2010 WL 4963021, at *3 ("Ms. Jordan was *unshaken* in her assertion that Plaintiff's pregnancy was not in any way the reason she was terminated." (emphasis added)). As aptly summarized by Ms. Brown,

> [V]iewing the evidence in its totality, the jury was presented with the following reasonable inferences . . . : (1) lawyer Jordan was aggravated by Brown's pregnancy and was the mastermind behind her termination; (2) the Phoenix postponement was not because Brown wasn't ready but was to enable Jordan time to go around . . . Beecher to get "documentation;" (3) to then get Brown terminated before an official territory announcement was

- 15 -

made; and (4) all of this explained Beecher's inconsistent positive feedback to Brown right up to termination day. While YRC countered with its own inferences, a reasonable jury could reject them as unsupported by the evidence, and did so in favor of Plaintiff.

Aplt. Reply Br. at 27-28 (citation omitted).

### III. Conclusion

Because a reasonable jury could conclude Ms. Brown met her burden of demonstrating YRC's proffered reason for terminating her employment was a pretext for pregnancy discrimination, we REVERSE the judgment of the district court, REINSTATE the jury's verdict, and REMAND the case for a determination of attorney's fees.

Entered for the Court


Michael R. Murphy
Circuit Judge